CASE NO. 24-2048

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

CAROLYN HALL

Plaintiff – Appellant

v.

SHEPPARD PRATT HEALTH SYSTEM, INC.

Defendant – Appellee

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

(The Honorable Adam B. Abelson, J.)

RESPONSE BRIEF OF APPELLEE

Paul D. Burgin
Garrick M. Ross
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
One South Street – Suite 1800
Baltimore, MD 21202
Telephone: (410) 843-3473
paul.burgin@ogletree.com
garrick.ross@ogletree.com

April 15, 2025          *Attorneys for Defendant-Appellee*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rules of Appellate Procedure, Rule 26.1, Sheppard Pratt Health System, Inc. is a non-profit corporation in the State of Maryland and is not a publicly owned company.

# TABLE OF CONTENTS

I.    STATEMENT OF SUBJECT MATTER JURISDICTION AND BASIS FOR APPELLATE JURISDICTION .............................................................1

II.   STATEMENT OF ISSUES PRESENTED FOR REVIEW............................1

III.  STATEMENT OF THE CASE ......................................................................1

     A.   Background About Sheppard Pratt ............................................................3

     B.   COVID-19's Substantial Impact on Sheppard Pratt's Operations............4

     C.   Sheppard Pratt's Patients, Particularly Those with Eating Disorders, are Especially Vulnerable to Adverse Effects from Covid-19. .......................6

     D.   Vaccination is the Best Measure to Reduce COVID-19 Infection and Transmission...................................................................................10

     E.   Sheppard Pratt's Implementation of its COVID-19 Vaccination Policy. 11

     F.   Appellant Carolyn Hall ........................................................................14

IV.  SUMMARY OF ARGUMENT ..................................................................18

V.   ARGUMENT...........................................................................................20

     A.   The Standard of Review ........................................................................20

     B.   The District Court Properly Granted Summary Judgment for Sheppard Pratt Because Appellant's Requested Accommodation Constituted an Undue Hardship........................................................................................21

          1.  The Legal Framework for Failure to Accommodate Claims..........21

          2.  The Undue Hardship Standard in Religious Accommodation Claims...........................................................................................22

          3.  Appellant's Requested Exemption from Sheppard Pratt's Vaccination Policy Posed an Undue Hardship Because her Job

Required Face-To-Face Contact with Vulnerable Patients and Other Employees ............................................................................26

    a. Appellant's Refusal to Obtain the COVID-19 Vaccine Risked Harming Vulnerable Patients and Staff ...................................29

    b. Appellant's Attempts to Minimize Interactions with Patients, Their Families, and Other Staff are Futile ................................33

  4. It is Undisputed that Sheppard Pratt Considered Other Options....36

    a. Remote work Would have Imposed an Undue Hardship as it Required Waiving an Essential Job Function............................37

    b. Masking and Weekly Testing were Ineffective Alternatives to Vaccination ................................................................39

    c. Appellant's Argument that she Could have been Accommodated by use of Zoom or Teams or Plexiglass Barriers is not Preserved and Lacks Merit .........................................................42

    d. Sheppard Pratt Offered Appellant the Opportunity to Transfer to a Remote Position....................................................43

  5. Sheppard Pratt's Approach to Medical Exemptions did not Require it to Grant Appellant's Request .......................................44

  6. Appellant's Catch-All Arguments are also Unavailing .................48

C. The District Court Properly Granted Summary Judgment on Appellant's Disparate Treatment Claim....................................................53

IV.   CONCLUSION............................................................57

# TABLE OF AUTHORITIES

**Cases**

*Abadi v. Target Corp.*,
No. 23-2892, 2024 WL 1715403 (3d Cir. Apr. 22, 2024) ........................................31

*Algarin v. NYC Health + Hosps. Corp.*,
678 F. Supp. 3d. 497 (S.D.N.Y. 2023) ....................................................................35

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................................20

*Antredu v. Mass. Dep't of Youth Servs.*,
729 F. Supp. 3d 76 (D. Mass. 2024) ................................................................. 28, 38

*Aukamp-Corcoran v. Lancaster Gen. Hosp.*,
No. 19-5734, 2022 WL 507479 (E.D. Pa. Feb. 18, 2022) ................................. 46, 47

*Bell v. Brockett*,
922 F.3d 502 (4th Cir. 2019) ......................................... 21, 37, 42, 48, 50

*Bordeaux v. Lions Gate Ent., Inc.*,
703 F. Supp. 3d 1117 (C.D. Cal. 2023) ..................................................................29

*Brown v. MGM Grand Casino*,
No. 2:22-CV-12978, 2024 WL 4819575 (E.D. Mich. Nov. 18, 2024) ..................45

*Bryant v. Bell Atl. Md., Inc.*,
288 F.3d 124 (4th Cir. 2002) ..................................................................................20

*Bushra v. Main Line Health, Inc.*,
709 F.Supp.3d 164 (E.D. Pa. Dec. 28, 2023) .........................................................27

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ................................................................................................20

*Chalmers v. Tulon Co. of Richmond*,
101 F.3d 1012 (4th Cir. 1996) ................................................................................53

*Coleman v. Maryland Ct. of Appeals*,
626 F.3d 187 (4th Cir. 2010) ...................................................................53

*Cyr v. Bos. Med. Ctr.*,
No. 1:22-CV-11930-JEK, 2025 WL 269239 (D. Mass. Jan. 22, 2025) ........... 23, 27

*D'Cunha v. Northwell Health Sys.*,
No. 1:22-CV-0988 (MKV), 2023 WL 2266520 (S.D.N.Y. Feb. 28, 2023). ...........57

*Dash v. Mayweather*
731 F.3d 303 (4th Cir. 2013) ...................................................................31

*Davis v. Reliance Test & Tech., LLC*,
No. CV DKC 22-1760, 2025 WL 266664 (D. Md. Jan. 22, 2025) ........................28

*E.E.O.C. v. Firestone Fibers & Textiles Co.*,
515 F.3d 307 (4th Cir. 2008) ...................................................................33

*E.E.O.C. v. GEO Grp., Inc.*,
616 F.3d 265 (3d Cir. 2010)....................................................................23

*E.E.O.C. v. Greyhound Lines, Inc.*,
554 F. Supp. 3d 739 (D. Md. 2021) .................................................21, 23

*Efimoff v. Port of Seattle*,
v No. 2:23-CV-01307-BAT, 2024 WL 4765161 (W.D. Wash. Nov. 13, 2024).....40

*Felty v. Graves-Humphreys Co.*,
818 F.2d 1126 (4th Cir. 1987) .................................................................21

*Groff v. DeJoy*,
600 U.S. 447 (2023)................................................... 19, 22, 23, 36, 45

*Haynes v. Waste Connections, Inc.*,
922 F.3d 219 (4th Cir. 2019) ...................................................................55

*Jean-Pierre v. Naples Cmty. Hosp., Inc.*,
817 F. App'x 822 (11th Cir. 2020) ...........................................................25

*Kizer v. St. Jude Children's Rsch. Hosp., Inc.*,
741 F. Supp. 3d 726 (W.D. Tenn. 2024) ................................................... 27, 38, 40

*Lavelle-Hayden v. Legacy Health*,
744 F.Supp.3d 1135 (D. Or. Aug. 14, 2024) ................................................ 25, 26

*Lightner v. City of Wilmington, N.C.*,
545 F.3d 260 (4th Cir. 2008) .................................................................55

*MacDonald v. Oregon Health & Sci. Univ.*,
No. 22-cv-01942-IM, 2024 WL 3316199 (D. Or. July 5, 2024) ............................23

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)...........................................................................20

*Melino v. Bos. Med. Ctr.*,
127 F.4th 391 (1st Cir. 2025)............................................................ 27, 31

*Miller v. Charleston Area Med. Ctr.*,
No. 2:23-CV-00340, 2024 WL 4518293 (S.D.W. Va. Oct. 17, 2024)...................28

*Panozzo v. Riverside Healthcare*,
No. 21-CV-2292, 2022 WL 18779991 (C.D. Ill. Jan. 2, 2022)....................... 25, 40

*Robinson v. Children's Hosp. Bos.*,
No. CV 14-10263-DJC, 2016 WL 1337255 (D. Mass. Apr. 5, 2016)...................47

*Rodrique v. Hearst Communications, Inc.*,
126 F.4th 85 (1st Cir. 2025)..................................................................25

*Savel v. MetroHealth Sys.*,
No. 1:22-CV-02154, 2024 WL 4581542 (N.D. Ohio Oct. 25, 2024).....................27

*Snow v. Women's Healthcare Associates, LLC*,
2024 WL 3640111 ............................................................................40

*Stokes v. Stirling*,
64 F.4th 131 (4th Cir. 2023) ........................................................... 21, 54

*Stroup v. Coordinating Ctr.*,
No. CV MJM-23-0094, 2023 WL 6308089 (D. Md. Sept. 28, 2023) .............. 48, 49

*Thompson v. Asante Health Sys.*,
No. 1:23-CV-00486-CL, 2023 WL 7348812 (D. Or. Sept. 21, 2023) ...................45

*T-Mobile Ne., LLC v. City Council of Newport News, Va.*,
674 F.3d 380 (4th Cir. 2012) ...................................................................20

*Together Emps. v. Mass Gen. Brigham Inc.*,
573 F. Supp. 3d 412, 435 (D. Mass. 2021) ......................................... 24, 27, 41, 47

*United States v. Hansen*,
No. EP-12-CR-314-PRM, 2020 WL 7487836 (W.D. Tex. Dec. 10, 2020) ...........34

*United States v. Kearney*,
No. CR ELH-18-17, 2021 WL 3883593 (D. Md. Aug. 31, 2021) ........................12

## Statutes and Rules

28 U.S.C. § 1291 ..........................................................................................1
42 U.S.C. §§ 2000e .......................................................................................1
86 Fed. Reg. 61555-01 (2021) ......................................................................41
86 Fed. Reg. 61614 (2021) ...........................................................................41
Fed. R. App. P. 28(a)(8)(A) .................................................................... 21, 54
Fed. R. Civ. P. 56 .......................................................................................20

## Miscellaneous Authorities

E.E.O.C. (2022, March 1) *What you Should Know About Covid-19 and the ADA,
the Rehabilitation Act, and Other EEO Laws*, Section L.3.,
https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-
rehabilitation-act-and-other-eeo-laws ...................................................................24

# I. STATEMENT OF SUBJECT MATTER JRUISDICTION AND BASIS FOR APPELLATE JURISDICTION

The action alleges violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e-17, giving the District Court subject matter jurisdiction. The District Court disposed of this action by granting summary judgment to Appellee, Sheppard Pratt Health System, Inc., on September 20, 2024. Appellant's Notice of Appeal was filed on October 18, 2024. Thus, the appellate jurisdiction of this Court is based on 28 U.S.C. § 1291.

# II. STATEMENT OF ISSUES PRESENTED FOR REVIEW

I.      Whether the District Court properly granted summary judgment for Appellee on Appellant's religious discrimination claim under Title VII, given the undisputed evidence demonstrating that allowing Appellant to work unvaccinated in a healthcare setting, where she had face-to-face contact with Sheppard Pratt's most vulnerable patients and other employees, would have imposed an undue hardship.

# III. STATEMENT OF THE CASE

Appellee, Sheppard Pratt Health System, Inc. ("Sheppard Pratt"), is a private non-profit behavioral health organization that provides a full range of services to meet the needs of children, adolescents, adults, and older adults. Sheppard Pratt operates the Center for Eating Disorders, located in its 322-bed psychiatric hospital in Towson, Maryland (the "Hospital"). During the deadly COVID-19 pandemic which killed over one million Americans, Sheppard Pratt implemented a COVID-19

vaccination policy in an effort to protect its vulnerable patient population, and its staff, visitors, and the public from COVID-19. At the time, COVID-19 cases were surging due to the spread of the highly contagious Delta variant.

Appellant was an Admissions Coordinator in Sheppard Pratt's Center for Eating Disorders. She alleges that Sheppard Pratt discriminated against her based on her religion in violation of Title VII by denying her request to forego the COVID-19 vaccine. Appellant contends she should have been permitted to work unvaccinated while interacting in person with the Hospital's most medically vulnerable patients.

Sheppard Pratt considered Appellant's request and determined it could not accommodate the request without incurring an undue hardship. Granting Appellant's request would have unacceptably increased the risk of COVID-19 transmission in the Center for Eating Disorders, posing a significant threat to the health and safety of the patients who entrusted Sheppard Pratt with their care and Sheppard Pratt's employees. Appellant's position required in person contact with the Hospital's most medically vulnerable patients. Appellant had daily close interaction with other employees, including one with whom she shared a small office. The safety risk posed by Appellant would have been a substantial burden to Sheppard Pratt, as it would have impaired the most central element to its business: the well-being of its patients.

Moreover, Appellant could not perform her essential job functions remotely, and thus remote work would not have been a reasonable accommodation.

After consideration of alternative accommodations, none of which were feasible, Sheppard Pratt terminated Appellant's employment for her failure to obtain the COVID-19 vaccine. On December 18, 2022, Appellant filed the instant suit in the United States District Court for the District of Maryland, wherein Appellant claimed that Sheppard Pratt violated Title VII by failing to accommodate her religious objection to the COVID-19 vaccine. The District Court granted summary judgment in favor of Sheppard Pratt on September 20, 2024, holding that accommodating Sheppard Pratt would have caused an undue hardship to Sheppard Pratt and that Appellant could not establish a viable case of disparate treatment. This appeal followed.

## A. Background About Sheppard Pratt.

Sheppard Pratt is a private, non-profit behavioral health organization providing a range of services in various settings to meet the needs of children, adolescents, adults, and older adults. JA47. Sheppard Pratt operates a 322-bed psychiatric hospital in Towson, Maryland. JA47. That facility provides inpatient and outpatient short and long-term treatment of adults, young adults, and children with psychiatric disorders, including eating disorders, psychotic disorders, and trauma disorders. JA47. By maintaining the highest standards of care, Sheppard Pratt has

consistently been ranked as a top national psychiatric hospital by U.S. News & World Report for the past 30 years. JA47.

**B. COVID-19's Substantial Impact on Sheppard Pratt's Operations.**

On January 31, 2020, the United States Department of Health and Human Services declared COVID-19 a national public health emergency. JA47. On March 5, 2020, Maryland Governor Larry Hogan issued a Declaration of State of Emergency and Existence of a Catastrophic Health Emergency due to COVID-19. JA 47. On March 11, 2020, the World Health Organization declared COVID-19 a pandemic. JA47. On March 13, 2020, Baltimore County Executive Johnny Olszewski issued an Emergency Declaration and local state of emergency due to COVID-19. JA48.

In response to the COVID-19 pandemic, Sheppard Pratt established an infection control department to monitor and implement COVID-19 protocols. JA 48. In doing so, it relied on statistics and guidance from the Centers for Disease Control and Prevention and Maryland Department of Health ("MDH"). JA48. As a long-term hospital and acute care center Sheppard Pratt had an obligation to track and report COVID-19 outbreaks to the MDH. JA48.

Sheppard Pratt implemented a COVID-19 management program which provides that patients who test positive for COVID-19 be placed in isolation, each in a single room with a dedicated bathroom and be precluded from attending

communal activities or communal dining until clinically cleared to end isolation. JA48. From September 30, 2020, through November 12, 2021, the Hospital reported 22 COVID-19 outbreaks to the MODH. JA48. These outbreaks lasted between 10 and 38 days. JA48. Outbreaks required the Hospital to alter programming for all patients on the unit where the outbreak occurred to prevent further outbreaks. JA48. This disrupted the treatment of all patients on the unit for the entire time the unit was on outbreak status. JA48. If a unit was on outbreak status, patients could not leave the unit and communal and dining activities on the unit ceased until the unit was no longer on outbreak status. JA48.

If a patient tested positive for COVID-19, Sheppard Pratt maintained one-on-one or one-on-two staffing to prevent employees from interacting with patients positive with COVID-19 and then interacting with non-positive patients. JA48-49. Maintaining this level of staffing with its own employees was difficult for the Hospital given the workforce and nursing shortage. JA49, JA77. As a result, Sheppard Pratt often relied on agency coverage to adequately and safely staff its facilities. JA49. Agency coverage is more expensive on a per hour basis than staffing through Sheppard Pratt's own employees. JA49.

If a patient tested positive for COVID-19, staff wore additional Personal Protective Equipment ("PPE") to protect themselves against COVID-19. JA49. This

included face shields or goggles, gloves, isolation gowns, and N95 masks or higher respirators. JA49. The additional PPE came at a cost to Sheppard Pratt. JA49.

In sum, the impact of the COVID-19 virus on Sheppard Pratt, its patients, residents, employees, and the community it is committed to servicing was significant. JA49. Outbreaks caused health risks to Sheppard Pratt's patients and employees, and impacted Sheppard Pratt's ability to adequately staff its Hospital and render first class care to its patients. JA49.

### C. Sheppard Pratt's Patients, Particularly Those with Eating Disorders, are Especially Vulnerable to Adverse Effects from COVID-19.

Sheppard Pratt's Center for Eating Disorders, located within the Hospital, contains a 24-bed inpatient unit designed with an emphasis on safe and effective treatment for individuals with a variety of eating disorders. JA49. Eating disorders are potentially life-threatening conditions that affect a person's emotional and physical health. JA49. The Center for Eating Disorders treats far more medically fragile individuals than any other unit in the Hospital. JA49. The unit is considered a medical psychiatric unit more so than any other unit at the Hospital. JA52. Indeed, the Center for Eating Disorders frequently treats patients following lengthy medical hospitalizations and patients at risk of medical hospitalization due to their illness. JA52.

Anorexia nervosa is an eating disorder characterized by extreme restriction of food intake and an intense fear of gaining weight. JA50. Health consequences of

anorexia nervosa include irregular heartbeats; loss of bone mass and tooth enamel erosion; kidney and liver damage; fatty liver disease; seizures caused by low blood sugar; rapid breakdown of skeletal muscle due to loss of water and electrolyte/acid-base imbalances; delayed puberty and physical growth; infertility and menstrual problems; insomnia; anemia; ventricular arrhythmia; mitral valve prolapse; fatigue, fainting, and weakness; cardiac arrest; and death. JA50. Anorexia nervosa has a high death rate compared with other mental disorders. JA50.

Bulimia nervosa is a condition where people have recurrent episodes of eating unusually large amounts of food and feeling a lack of control over their eating. JA50-51. This binge eating is followed by compensation for the overeating to prevent weight gain, such as forced vomiting, excessive use of laxatives or diuretics, fasting, excessive exercise, or a combination of these behaviors. JA50-51. Health consequences of bulimia nervosa include throat and stomach ulcers; tooth decay and cavities; esophagus inflammation and tears; damage to intestines and stomach damage; electrolyte imbalance; abnormal heart rhythm; and heart failure. JA51.

Binge eating disorder is a behavioral disorder characterized by chronic, compulsive overeating. JA51. Health consequences of binge eating disorder include high blood pressure; high cholesterol; cardiovascular disease; diabetes; liver and gallbladder disease; sleep apnea and breathing problems. JA51.

Rates of mortality in eating disorder patients are high due to restrictive eating, disordered eating, or suicidal ideation. JA51. Many eating disorder patients have had feeding tubes or are at severe risk for needing feeding tubes and IV hydration. JA52. Given the precarious condition of the Center for Eating Disorder's patients, it is routine for the Hospital to obtain daily lab reports on these patients in a manner similar to a medical hospital. JA52.

Eating disorder patients experience end organ damage. JA52. Inflammation exacerbates end organ damage and can lead to death. JA52. COVID-19 triggers inflammation in the body, placing eating disorder patients at risk of significant adverse health effects from COVID-19. JA52. Furthermore, patients with eating disorders commonly experience co-occurring behavioral or mood disorders or trauma such as depression. JA52. Mental health disorders can double someone's risk of dying or being hospitalized from COVID-19. JA52-53.

The eating disorders program is one of the most regimented programs offered by the Hospital. JA53. Patients seeking care at Sheppard Pratt come from across the nation and have often failed treatment at multiple other hospitals. JA53. The eating disorders program entails significant daily interaction with others in close proximity in a group therapy setting. JA53. Group programming is essential to delivering better outcomes for these patients. JA53.

Patients eat their meals with clinicians present to work with them on their eating habits. JA53. This entails close contact between staff and patients. JA53. Staff and patients also have close contact because patients need frequent blood pressure and vital sign checks. JA53. Moreover, eating disorder patients cannot use the restroom or flush the toilet without staff present to inspect the toilet before it is flushed to ensure that patients do not purge into the toilet. JA53. This further requires close human contact between patients and staff. JA53.

The COVID-19 pandemic caused an increase in cases of eating disorders because eating disorders are triggered by isolation. JA53. Patients who contract COVID-19 must be isolated in separate rooms. JA53-54. Social isolation is injurious to a behavior health patient's treatment. JA53-54. This is even more true with eating disorder patients given the importance of human interaction and group programming in their treatment and the manner in which social isolation exacerbates their condition. JA53-54.

In some instances, patients who contract COVID-19 are sent to an acute care facility. JA54. This interrupts and extends their psychiatric treatment, which can be devastating to the progression of their treatment. JA54. An outbreak of COVID on the eating disorders unit, beyond the deleterious effects for the patients on the unit, leads to a stoppage in admissions to the unit – cutting off a life-saving service to the community and impacting the health of the broader community. JA54. Given the

close interaction required in the eating disorders program and the harm contracting COVID-19 poses to their health and treatment, it was imperative that Sheppard Pratt exercised the utmost care and precaution to prevent the spread of COVID-19 on this unit. JA54.

### D. Vaccination is the Best Measure to Reduce COVID-19 Infection and Transmission.

Vaccinations against COVID-19 in the United States began on December 14, 2020. JA54. The efficacy of COVID-19 vaccines is well documented. JA 54. Individuals vaccinated against COVID-19 are less likely to contract COVID-19 than unvaccinated individuals. JA54-55. Indeed, a November 2021 CDC study estimated that vaccinated individuals are approximately three times less likely to be infected with COVD-19 than nonvaccinated individuals. JA55. The COVID-19 vaccines have high efficacy and are the safest strategy in protecting against known variants, including the Delta variant, particularly in preventing infections, hospitalizations, and death. JA55-56. Vaccinated individuals are also less likely than unvaccinated individuals to transmit COVID-19 to others. JA56. The CDC explained that transmission between unvaccinated individuals is the primary cause of continued spread of COVID-19. JA56.

Sheppard Pratt required all employees regardless of vaccination status to wear masks. JA56. Vaccines provide greater protection against COVID-19 than masking. JA56-57. Vaccines also provide greater protection than weekly COVID-19 tests.

JA56-57. An individual can test negative for COVID-19 and still have COVID-19. JA57. An individual who tests negative for COVID-19 may subsequently contract and carry COVID-19, yet they will not be tested again for another week. JA57. Thus, testing once per week is inadequate to protect against the transmission of COVID-19 because, among other reasons, it is not adequate to identify precisely when an employee is infected and contagious because employees are at constant risk of infection. JA57.

Sheppard Pratt could not sustain a broad, on-site prospective COVID-19 testing operation. JA57. As a private non-profit entity, Sheppard Pratt did not have the capacity or the resources to implement weekly or daily COVID-19 testing on-site for employees. JA57. Additionally, prior COVID-19 infection a substitute for vaccination, because prior infection does not prevent future reinfection. JA57. In 2021, it was recommended that anyone who had COVID-19 still receive the COVID-19 vaccination. JA57.

### E. Sheppard Pratt's Implementation of its COVID-19 Vaccination Policy.

On August 18, 2021, the Maryland Secretary of Health issued an Amended Directive and Order Regarding Vaccination Matters, which required that all employees of healthcare facilities such as Sheppard Pratt be vaccinated against COVID-19 by September 1, 2021. JA58. Sheppard Pratt announced on August 20, 2021 that it would be implementing a Vaccination Policy which required all

employees to have their first dose of the COVID-19 vaccine by September 1, 2021. JA58, JA67-68, JA195-196. The announcement further directed employees to send requests for medical or religious exemptions to Employee Relations. JA67.

At the time, COVID-19 cases were surging due to the spread of the highly contagious Delta variant.[1] JA58. Weekly COVID-19 new hospital admissions in the United States reached 84,035 on August 21, 2021, the highest level since January 23, 2021. JA58. Weekly COVID-19 new hospital admissions in Maryland reached 627 on August 21, 2021, the highest level since May 8, 2021. JA59. There were 16.58 cases of COVID-19 in Maryland per 100,000 people statewide on August 20, 2021, the highest number since April 24, 2021. JA59. This was a 1,509.7% increase from June 20, 2021, a 411.73% increase from July 20, 2021, and a 106.73% increase from August 1, 2021. JA59. As of August 21, 2021, 642,879 individuals in the U.S. and 10,654 individuals in Maryland had died of COVID-19. JA59.

Effective November 5, 2021, the U.S. Centers for Medicare & Medicaid Services published the Omnibus COVID-19 Health Care Staff Vaccination Interim Final Rule, requiring that all staff of covered facilities be fully vaccinated against COVID-19. JA59. Sheppard Pratt was covered by the Interim Final Rule. JA59.

---

[1] "[T]he Delta variant [wa]s thought to be more virulent and capable of causing more severe illness than earlier strains of COVID-19." *United States v. Kearney*, No. CR ELH-18-17, 2021 WL 3883593, at *6 (D. Md. Aug. 31, 2021) (noting that the Delta variant is more than twice as contagious as prior variants).

While the Interim Final Rule, provided that covered facilities must allow for medical and religious exemptions, it states that exemptions may not be granted except where legally required by the Americans with Disabilities Act or Title VII. JA59.

Sheppard Pratt's Vaccination Policy provides that exemptions to the mandatory vaccination requirement for religious or medical reasons will be considered and that Sheppard Pratt may grant staff a religious exemption from the policy based on a sincerely held religious belief. JA73. The Policy further provides that exemption requests would be carefully reviewed on a case-by-case basis; however, approval of such requests is not guaranteed, as "Sheppard Pratt may determine that the risk posed by an unvaccinated staff member cannot be mitigated and/or constitutes an 'undue hardship' under state and federal law." JA73.

Sheppard Pratt reviewed each exemption request on a case-by-case basis. JA227. Upon receipt of each request, Sheppard Pratt's Vice President of Human Resources, Karen Robertson-Keck, spoke with the employee's manager to discuss the employee's job duties. JA221, JA226. If the employee's job involved in-person contacts, Ms. Robertson-Keck and the manager explored whether the position's essential functions could be performed without in-person contact. JA222, JA226. As part of the interactive process, Ms. Robertson-Keck met with every employee who requested an exemption to the Vaccination Policy to discuss their proposed accommodation. JA218-219, JA222. Ms. Robertson-Keck informed employees who

requested religious exemptions that the Hospital in no way questioned the sincerity of their beliefs. JA222.

If the employees' job functions could be performed remotely, Sheppard Pratt accommodated them and permitted them to work remotely. JA223. If not, Ms. Robertson-Keck explored with them whether they had other skillsets that would qualify them for positions that did not need to be performed in person. JA223.

Requests for medical exemptions were sent to a third-party medical doctor, Dr. Ahmed Nawaz, who reviewed medical exemption requests on a case-by-case basis. JA78. Dr. Nawaz gave recommendations to Sheppard Pratt based on CDC guidance regarding COVID-19 vaccine contraindications. JA219-220. Individuals who did not have their exemptions granted were terminated and remain eligible for rehire. JA239.

### F. Appellant Carolyn Hall

On May 7, 2007, Sheppard Pratt hired Appellant as a part-time staff nurse in the Division of Female Child and Adolescent Services. JA176-177, JA180-181. As part of her application, Appellant agreed to "be immunized as necessary." JA173. In March 2010, Appellant became an Admissions Nurse in the Center for Eating Disorders. JA179. From 2015-2020, Appellant was stationed at Greater Baltimore Medical Center; however, in January 2020, Appellant moved back to work in Sheppard Pratt's Towson hospital. JA178, JA184. In 2020, Appellant's job title

changed from Admissions Nurse to Admissions Coordinator in the Center for Eating Disorders. JA194.

Appellant worked Monday through Friday from 8:00 a.m. to 2:30 p.m. and shared a small office that was approximately 10 feet by 10 feet with another employee, Kaitlyn Fowler. JA187-188. Appellant and Ms. Fowler's hours overlapped significantly, requiring them to be in the office together at the same time for much of the day. JA187-188. Appellant interacted with Ms. Fowler, her manager, Jennifer Mittelman, and admissions secretaries on a daily basis. JA189-190.

As an essential function of her position, Appellant coordinated new admissions to the eating disorders unit. Her position required in person contact with medically compromised patients with eating disorders and their families, as she greeted and spoke with them to have them admitted to the Hospital. JA186-187, JA189-193. The amount of time Appellant spoke with patients and their families varied. JA192. Appellant testified that if the patient was a minor with concerned parents, "it could be a long talk." JA192. Generally, Appellant had 30 to 45 minutes of contact with patients and their families. JA240. Likewise, Appellant testified that she could not perform the essential functions of her position from home. JA210-211.

Appellant testified that individuals with eating disorders are "quite often" medically compromised. JA182. Some patients were so compromised they needed to be transported from hospitals in an ambulance and Appellant at times greeted

patients who were brought in on stretchers because they were unable to walk. JA185, JA190, JA192.

On August 30, 2021, Appellant submitted a request for a religious accommodation to the Vaccination Policy. JA20, JA198-199.

In support of her request for a religious exemption, Appellant wrote:

My belief is that my body is a sacred temple belonging to my Creator, God. I bear responsibility to refrain from potential harm such as the COVID vaccine. Additionally, God alone is the giver + taker of life. I object to the use of fetal cells for any reason including the research of COVID-19 vaccines.

JA19.

Appellant's request for a religious exemption further indicated that she tested positive for COVID-19 in November 2020 and therefore had natural immunity. JA19. Appellant also included a letter from Pastor Jason Moore in support of her request. JA22, JA197.

Appellant believed the COVID-19 vaccine was a potential harm to her body because "it was an experimental inoculation." JA200, JA201. Accordingly, she was opposed to taking the COVID-19 vaccine even if fetal cell lines had not been used in the development process. JA201. However, Appellant received the influenza vaccine from 2013 through 2020. JA174-175.

Ms. Robertson-Keck met with Ms. Mittelman to assess whether Appellant's duties could be shifted such that she could perform the essential functions without

being face-to-face with patients and other employees. JA228-231, JA241. On October 14, 2021, Appellant met with Ms. Robertson-Keck, Ms. Mittelman, and Director of Employee Relations, Ricky Santico, to discuss her religious exemption request. JA202-203.

During the meeting, Ms. Robertson-Keck indicated that Sheppard Pratt respected and did not contest the sincerity of Appellant's religious beliefs. JA14, JA214, JA231. Appellant stated that because she had had COVID-19, she had natural immunity. JA242. She further stated, "What value would my convictions have if I changed my mind?" JA203. Appellant sought to be accommodated with masking and weekly testing. JA203.

Sheppard Pratt concluded that Appellant could not be accommodated in her current position because it was a patient-facing position with medically vulnerable patients, and an unvaccinated individual in this position posed a safety risk. JA206, JA214-215, JA229-230, JA233-234. Additionally, Appellant shared a small office with another employee. JA187-188, JA241.

During the meeting, Ms. Robertson-Keck told Appellant she could search for positions that could accommodate her in an unvaccinated status. JA204. Appellant testified that she looked for other jobs that would have been accommodating but felt that "none of them would have worked for [her]." JA204-205. Accordingly, Appellant did not apply to transfer to another position. JA204-205, JA233-234.

On October 29, 2021, Appellant asked Ms. Robertson-Keck why she could not be accommodated with weekly testing. JA207-208. Ms. Robertson-Keck scheduled a Zoom meeting with Appellant to discuss this with her, however, Appellant cancelled the meeting. JA208-209. Appellant was terminated effective November 12, 2021, but remains eligible for rehire. JA172, JA212.

As of Appellant's termination, Sheppard Pratt had granted two religious requests for exemptions for employees who worked at the Hospital because the employees could perform the essential functions of their position from home. JA78. As of Appellant's termination, ten individuals at the Hospital had requested a medical exemption to the Vaccination Policy, seven of which were approved by Dr. Nawaz. JA78. None of them worked in the Center for Eating Disorders. JA78.

## IV. SUMMARY OF ARGUMENT

The District Court correctly applied the law to the undisputed facts in dismissing Appellant's cause of action for religious discrimination. As part of Appellant's essential job functions as the Center for Eating Disorders' Admissions Coordinator, she regularly worked face-to-face with new patients and staff members. Patients in the Center for Eating Disorder are at particular risk of contracting COVID-19 and suffering severe reactions to the virus. In the event of an outbreak in the Center for Eating Disorders, patients were isolated and activities in the unit were suspended.

To manage the risks COVID-19 posed, Sheppard Pratt implemented its COVID-19 Vaccination Policy. Appellant requested a religious exemption. When Sheppard Pratt determined it could not accommodate Appellant without suffering undue hardship, it terminated her employment, but designated her eligible for rehire. Appellant subsequently alleged Sheppard Pratt discriminated against her based on her religious beliefs.

Appellant's requested exemption from Sheppard Pratt's Vaccination Policy would have created undue hardship. The safety and reputational costs of accommodating Appellant were substantial under *Groff v. DeJoy*, 600 U.S. 447, 468 (2023). Appellant's face-to-face interactions with patients, and staff who interacted with patients, risked infecting medically vulnerable individuals and impeding their treatment for eating disorders. Appellant failed to present admissible evidence sufficient to raise a genuine issue of material fact as it concerns this undue hardship.

To the extent Appellant made a claim for disparate treatment, she failed to raise issue with the District Court's grant of summary judgment on this claim and therefore waived it before this Court. Nonetheless, the District Court properly found that Appellant could not establish a *prima facie* case for such a claim.

Consequently, the District Court's summary judgment in Sheppard Pratt's favor was appropriate and should be affirmed.

# V. ARGUMENT

## A. The Standard of Review.

This Court reviews *de novo* a district court's order granting summary judgment. *T-Mobile Ne., LLC v. City Council of Newport News, Va.*, 674 F.3d 380, 384–385 (4th Cir. 2012). Under Fed. R. Civ. P. 56, the moving party is entitled to summary judgment if it can demonstrate that: (1) there is no genuine dispute as to any material fact; and (2) summary judgment is appropriate as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Where, as here, Sheppard Pratt made an initial showing of the absence of a genuine issue of material fact, Appellant was required to "go beyond the pleadings" and identify "specific facts" in the record "showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

This Court has stated that "[a]n otherwise properly supported motion for summary judgment will not be defeated by the existence of some factual dispute; rather, '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002) (quoting *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001)). Furthermore, a district court has an "affirmative obligation . . . to prevent 'factually unsupported claims [or] defenses'

from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex Corp.*, 477 U.S. at 323–24).

Rule 28 of the Federal Rules of Appellate Procedure requires Appellant's brief to "contain appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies[.]" Fed. R. App. P. 28(a)(8)(A). "[A] party's failure to raise or discuss an issue in itsappellate brief is to be deemed an abandonment of that issue." *Stokes v. Stirling*, 64 F.4th 131, 137 (4th Cir. 2023) (quoting *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012)). Likewise, "[a]ppellants may not raise arguments on appeal that were not first presented below to the district court." *Bell v. Brockett*, 922 F.3d 502, 513 (4th Cir. 2019).

## B. The District Court Properly Granted Summary Judgment for Sheppard Pratt Because Appellant's Requested Accommodation Constituted an Undue Hardship.

### 1. The Legal Framework for Failure to Accommodate Claims.

To establish a *prima facie* failure-to-accommodate claim, an employee must present facts demonstrating: "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; [and] (3) he or she was disciplined for failure to comply with the conflicting employment requirement." *E.E.O.C. v. Greyhound Lines, Inc.*, 554 F. Supp. 3d 739, 751 (D. Md. 2021) (alteration in original) (internal quotation marks

omitted) (quoting *E.E.O.C v. Consol Energy, Inc.*, 860 F.3d 131, 141 (4th Cir. 2017)). "If the employee establishes a *prima facie* case, the burden then shifts to the employer to show that it could not accommodate the [employee's] religious needs without undue hardship." *Id.* (quoting *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1019 (4th Cir. 1996)). If the employer proves undue hardship, a claim for failure to accommodate fails as a matter of law. *Id.* at 752.

Sheppard Pratt has never contested the sincerity of Appellant's religious beliefs. Consequently, the sole issue before this Court is if Appellant's requested accommodation would have caused Sheppard Pratt undue hardship. The indisputable record evidence shows that Appellant's requested accommodations would have resulted in undue hardship for Sheppard Pratt. Appellant has failed to provide any legal or factual support to the contrary, either before this Court or during the proceedings below.

## 2. The Undue Hardship Standard in Religious Accommodation Claims.

While Title VII does not define "undue hardship," in *Groff v. DeJoy*, the Supreme Court explained that an undue hardship is one that is "substantial in the overall context of the employer's business." 600 U.S. 447, 468 (2023). Undue hardship exists when "the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id.* at 470.

Whether the costs are substantial requires looking at "all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size, and operating cost of [an] employer." *Id.* at 470–71 (alteration in original). Certainly, even "non-economic costs can pose an undue hardship upon employers." *Greyhound Lines, Inc.*, 554 F. Supp. 3d at 752 (internal quotation mark omitted) (quoting *Webb v. City of Philadelphia*, 562 F.3d 256, 260 (3d Cir. 2009)). "Relevant non-economic costs include health and safety risks, as well as the risk of reputational injury." *Cyr v. Bos. Med. Ctr.*, No. 1:22-CV-11930-JEK, 2025 WL 269239, at *5 (D. Mass. Jan. 22, 2025) (citing *Together Emps. v. Mass Gen. Brigham, Inc.*, 573 F. Supp. 3d 412, 435 (D. Mass. 2021), *aff'd*, 32 F.4th 82 (1st Cir. 2022) ("Considerations include not only direct economic costs, but indirect ones related to health and safety.")); *E.E.O.C. v. GEO Grp., Inc.*, 616 F.3d 265, 273 (3d Cir. 2010) ("A religious accommodation that creates a genuine safety or security risk can undoubtedly constitute an undue hardship[.]").

To determine the magnitude of an employer's hardship, courts must go beyond financial factors and conduct a comprehensive "assessment of a possible accommodation's effect on the conduct of the employer's business[,]" not the bottom line alone. *Groff*, 600 U.S. at 472 (internal quotation marks omitted); *MacDonald v. Oregon Health & Sci. Univ.*, No. 22-cv-01942-IM, 2024 WL 3316199, at *6 (D. Or. July 5, 2024) ("Following *Groff*, district courts have

continued to consider both economic and non-economic costs when conducting the undue hardship analysis.").

This is consistent with EEOC guidance as to what constitutes an "undue hardship":

> Costs to be considered include not only direct monetary costs but also the burden on the conduct of the employer's business – including, in this instance, the risk of spread of COVID-19 to other employees or to the public.
>
> Courts have found Title VII undue hardship where, for example, the religious accommodation would … **impair workplace safety** … or cause coworkers to carry the accommodated employee's share of potentially hazardous or burdensome work.
>
> …
>
> Certain common and relevant considerations during the COVID-19 pandemic include, for example, whether the employee . . . works outdoors or indoors, works in a solitary or group work setting, or has close contact with other employees or members of the public (**especially medically vulnerable individuals**). Another relevant consideration is the number of employees who are seeking a similar accommodation, i.e., the cumulative cost or burden on the employer.

*See What you Should Know About Covid-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, Section L.3., https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws (emphasis added).

Courts routinely decline to substitute their judgment for that of a healthcare employer on matters of patient safety during a pandemic. *Together Emps.*, 573 F.

Supp. 3d at 433 (quoting *Griel v. Franklin Med. Cen.*, 71 F. Supp. 2d 1, 9 (D. Mass. 1999) ("[T]his court should not second-guess the hospital's judgment in matters of public safety")); *Panozzo v. Riverside Healthcare*, No. 21-CV-2292, 2022 WL 18779991, at *9 (C.D. Ill. Jan. 2, 2022) ("During a public health crisis, the court in its considered judgment declines to substitute its own opinion for [the d]efendants' assessment of how to avoid undue hardship and continue serving its patients."); *Jean-Pierre v. Naples Cmty. Hosp., Inc.*, 817 F. App'x 822, 828 (11th Cir. 2020) (per curiam) (quoting *Beadle v. City of Tampa*, 42 F.3d 633, 636 (11th Cir. 1995) ("Where, as here, 'the employer's business involves the protection of lives,' we are reluctant to 'restructur[e] [its] employment practices.'") (alterations in original)).

Importantly, "it is appropriate to confine the analysis" of whether an undue hardship exists "to the information available to the employer when it made its undue hardship decision." *Lavelle-Hayden v. Legacy Health*, 744 F.Supp.3d 1135, 1152 (D. Or. Aug. 14, 2024); *see also Rodrique v. Hearst Communications, Inc.*, 126 F.4th 85, 91 (1st Cir. 2025) ((quoting *Bragdon v. Abbott*, 524 U.S. 624, 649–50 (1998) ("Because the record demonstrates that [the employer] relied on the objective, scientific information available to [it], with particular attention to the views of public health authorities, we hold that it acted reasonably when it determined that vaccinated employees are less likely to transmit COVID-19 than unvaccinated employees.") (internal quotation marks omitted) (second alteration in original)).

Indeed, "[i]t is axiomatic that an employer can make decisions based only on the information known to it at the time of the decision." *Lavelle-Hayden*, 744 F.Supp.3d at 1153.

Here, a comprehensive review of the costs, and based on the information available to Sheppard Pratt at the height of the COVID-19 pandemic, can only lead to the conclusion that Appellant's proposed accommodations would have caused Sheppard Pratt to suffer undue hardship.

### 3. Appellant's Requested Exemption from Sheppard Pratt's Vaccination Policy Posed an Undue Hardship Because her Job Required Face-to-Face Contact with Vulnerable Patients and Other Employees.

Appellant's requested exemption from Sheppard Pratt's Vaccination Policy would have resulted in undue hardship. Appellant's face-to-face interactions with the Center for Eating Disorders' staff and patients while unvaccinated would have unjustifiably increased the risk of COVID-19 infection and transmission. This heightened risk would have not only endangered the health and safety of patients due to COVID-19, but also jeopardized the effective treatment of their underlying conditions. These risks are substantial in the broader context of Sheppard Pratt's business. As such, the undisputed facts show that permitting Appellant to work unvaccinated would have imposed undue hardship on Sheppard Pratt.

Courts, both pre- and post-*Groff*, agree that unvaccinated employees, especially in a healthcare setting, pose a serious health risk to those that they

encounter which is sufficient to demonstrate an undue hardship. *Savel v. MetroHealth Sys.*, No. 1:22-CV-02154, 2024 WL 4581542, at \*12 (N.D. Ohio Oct. 25, 2024) (collecting cases); *Melino v. Bos. Med. Ctr.*, 127 F.4th 391, 397–98 (1st Cir. 2025) (affirming summary judgment in favor of hospital employer where employee's requested religious accommodation that she continue working unvaccinated would have posed an undue hardship by increasing the risk of COVID-19 transmission amongst patients and employees); *Bushra v. Main Line Health, Inc.*, 709 F.Supp.3d 164, 175–76 (E.D. Pa. 2023) (healthcare facility "would have incurred undue hardship in the form of substantial social, if not economic, costs if it had been required to accommodate" an emergency room physician's COVID-19 religious exemption request); *Cyr*, 2025 WL 269239, at \*6 (holding that permitting Staff Nurse to continue to work while unvaccinated constituted an undue hardship because it increased the risk plaintiff would contract and transmit COVID-19 to patients and staff members, which jeopardized safety, and "increased the risk of staffing shortages, which would have harmed BMC's ability to provide critical medical care to its patients" and "jeopardized its reputation of providing safe care to patients"); *Together Emps.*, 573 F. Supp. 3d at 441 (permitting unvaccinated plaintiffs to work at hospital would "materially increase the risk of spreading the disease and undermine public trust and confidence in the safety of its facilities[,]" which would result in an undue hardship under the ADA and Title VII); *Kizer v. St.*

*Jude Children's Rsch. Hosp., Inc.*, 741 F. Supp. 3d 726, 747 (W.D. Tenn. 2024), *aff'd sub nom. Kizer v. St. Jude Children's Rsch. Hosp.*, No. 24-5207, 2024 WL 4816856 (6th Cir. Nov. 18, 2024) (holding that plaintiff working unvaccinated endangered the health and safety of patients and staff, especially given that patients were more vulnerable to serious illness or death from COVID-19, and "the patients depend on St. Jude staff to remain healthy so they can properly administer patient care"); *Miller v. Charleston Area Med. Ctr.*, No. 2:23-CV-00340, 2024 WL 4518293, at *5 (S.D.W. Va. Oct. 17, 2024) ("being forced to accommodate an unvaccinated employee has been more than enough to pose an undue hardship for medical facilities across our nation actively combatting the COVID-19 pandemic even today[,]" and holding that it would be an undue hardship to accommodate unvaccinated patient-facing employee).

The threat of COVID-19 was so significant that courts have consistently held that permitting unvaccinated employees in non-healthcare settings likewise constitutes an undue hardship. *Davis v. Reliance Test & Tech., LLC*, No. CV DKC 22-1760, 2025 WL 266664, at *7 (D. Md. Jan. 22, 2025) (concluding that the employer established an undue hardship defense where the plaintiffs were unable to fully perform their jobs while unvaccinated and they posed a health risk to their coworkers and other individuals); *Antredu v. Mass. Dep't of Youth Servs.*, 729 F. Supp. 3d 76, 83–84 (D. Mass. 2024) (granting employer's motion for summary

judgment where permitting plaintiff, a juvenile justice youth development specialist, to work unvaccinated "would put his colleagues, clients, and their families at a higher risk for contracting COVID-19" and that his employer "may have also lost the confidence of some clients were they to learn that" plaintiff was working with youth while unvaccinated, which would have substantially burdened the employer); *Bordeaux v. Lions Gate Ent., Inc.*, 703 F. Supp. 3d 1117, 1135 (C.D. Cal. 2023), *aff'd*, No. 23-4340, 2025 WL 655065 (9th Cir. Feb. 28, 2025) (granting summary judgment on undue hardship basis because "[a]ccommodating Plaintiff's [COVID-19 vaccine] exemption request would have put the lives of her fellow cast and crew members in danger" and replacing coworkers who became seriously ill would have been expensive and time-consuming).

### a. Appellant's Refusal to Obtain the COVID-19 Vaccine Risked Harming Vulnerable Patients and Staff.

Appellant cannot credibly downplay the risk she posed to others in her patient-facing role if she remained unvaccinated. Simply, Appellant did not and does not dispute the overwhelming scientific and testimonial evidence showing her refusal to receive the vaccine made her significantly more likely to contract and transmit COVID-19 to patients and staff—putting them at serious risk. JA51-52, JA55-56. Indeed, Appellant would have significantly increased the risk of causing a COVID-19 outbreak, especially given the highly contagious Delta variant circulating at the time, among Sheppard Pratt's vulnerable patients and employees. JA55-56. This risk

was further exacerbated by the fact that Appellant shared a small office with another employee. JA187-188.

Appellant is unable to legitimately dispute the fact that if she contracted COVID-19 and infected a patient or infected an employee who infected a patient, the infection could be fatal. The risk to the unit's patients is greater given the medical vulnerabilities of eating disorder patients. JA51-54. As the District Court properly indicated, the illnesses common to the Center for Eating Disorders' patients makes them prone to harsher reactions and increases their mortality rate from a COVID-19 infection. JA285-286. Eating disorder patients experience end organ damage, and COVID-19 triggers inflammation in the body which exacerbates end organ damage, making infection potentially fatal. JA52. Finally, the undisputed evidence shows that mental health disorders can double the risk of dying or being hospitalized from COVID-19. JA52-53.

Appellant contends that Dr. Peters' affidavit, which provides critical information about the patients in Sheppard Pratt's Center for Eating Disorders and their underlying conditions, does not sufficiently cross-reference the "material facts" necessary for summary judgment in Sheppard Pratt's favor. However, Appellant is mistaken in her categorization of Dr. Peters' affidavit. The affidavit provides material facts and speaks directly to the nature of Sheppard Pratt's operations. Dr. Peters' affidavit lays the foundation for the grave risk posed by an unvaccinated

employee working in the Center for Eating Disorders, such as Appellant, who had contact with the Hospital's most vulnerable patients, and contact with employees who also had contact with those same patients.

That Dr. Peters does not mention Appellant by name does not mean that Sheppard Pratt has not demonstrated the safety risk she posed. Such a contention is illogical and requires this Court to ignore the obvious conclusions that can be drawn from the substance of the affidavit.[2] Neither does Appellant offer any rebuttal to the information in Dr. Peters' affidavit, despite her burden of presenting a genuine issue of material fact, beyond this flawed conclusory allegation. Accordingly, Appellant's erroneous contention is insufficient to create a genuine issue of material fact. *See Dash v. Mayweather,* 731 F.3d 303, 311 (4th Cir. 2013) (to create a genuine issue for trial, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence").

Similarly, Appellant is unable to dispute, and the District Court properly took into account, the detrimental impact that COVID-19 infections would have on the Center for Eating Disorders' treatment protocols and quality of care. JA285. Again, Appellant fails to provide any genuine dispute regarding the fact that a COVID-19

---

[2] The Court may take judicial notice of the CDC's recommendations and guidance. *Melino*, 127 F.4th at 397; *Abadi v. Target Corp.*, No. 23-2892, 2024 WL 1715403, at *2 (3d Cir. Apr. 22, 2024).

outbreak would severely disrupt the unit's operations. Sheppard Pratt had to modify treatment for all patients in a unit on outbreak status. JA53-54. Patients with COVID-19 were isolated in separate rooms and unable to participate in communal activities. JA53-54. This social isolation is especially harmful to eating disorder patients because human interaction and group programming is a vital part of their treatment and recovery. JA53-54. Moreover, eating disorders are triggered by isolation. JA53. Consequently, isolation due to a positive case or outbreak caused by Appellant would likely have worsened the patients' condition. JA53-54.

Not only would a COVID-19 outbreak caused by Appellant jeopardize the health and safety of patients and staff, admissions to the unit would have ceased— cutting off a lifesaving service and impacting the health of the broader community. JA54. Appellant's objection to the vaccine strikes at the heart of Sheppard Pratt's operations, hindering the care patients went to Sheppard Pratt to receive, or preventing individuals from being admitted to the Hospital to receive life-saving care. Such a hinderance to Sheppard Pratt's operation risked the perception that Sheppard Pratt was unable to protect or care for its patients and staff. Such a reputation could jeopardize public trust in Sheppard Pratt's treatment programs. As the District Court properly concluded, the undisputed evidence establishes that permitting Appellant to work unvaccinated would have entailed significant costs, risked patient and employee health, and impacted the health of the broader

community, thereby harming the Hospital's reputation. Thus, Sheppard Pratt would have suffered undue hardship if it accommodated Appellant's requested accommodation.

Indeed, the risk Appellant posed was not hypothetical. As the record described, the Hospital had reported twenty-two COVID-19 outbreaks prior to the implementation of its vaccination policy. JA48. Outbreaks could last more than a month, hindering patient treatment during this period. JA48. Infection resulting from Appellant's exemption request was not too attenuated and was precisely the risk Sheppard Pratt sought to minimize.

Nonetheless, even if the risk Appellant posed was speculative, Sheppard Pratt was not required to wait for an injury to occur before it determined Appellant posed an unacceptable safety risk. The law is clear that "an employer is not required 'to wait until it [feels] the effects' of the proposed accommodation before determining its reasonableness." *E.E.O.C. v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 317 (4th Cir. 2008) (alteration in original). Ultimately, Appellant's proposed exemption would have put lives at risk and the most effective means of curbing that risk was vaccination.

### b. Appellant's Attempts to Minimize Interactions with Patients, Their Families, and Other Staff are Futile.

Appellant's attempt to downplay the significance of her interactions with new patients to negate the risk she posed during the admissions process is unavailing.

She attempts to minimize the duration of her interactions with patients and their families, and contends that she did not perform "nursing actions." The contention Appellant raises regarding the length of time she spent with new patients and families is immaterial. Appellant alleged her interactions with patients and their families lasted between five and thirty minutes, but also conceded that her interactions with a patient could involve "a long talk." Her manager, Jennifer Mittelman, testified that these interactions lasted generally from 30 to 45 minutes. JA192, JA240. In either case, Appellant spent sufficient time with patients to infect them with COVID-19, the likelihood of which increased if she was unvaccinated.

Likewise, Appellant contends that these interactions could be conducted while masked and maintaining a six-foot distance from patients and family. Nothing Appellant cites supports this proposition and there are no citations in the record to support her assertion that she conducted such interactions while maintaining a six-foot distance from patients and their families. The record demonstrates that Appellant's position requires face-to-face interactions with patients. JA206, JA214-215; JA229-230, JA233-234. Nonetheless, even if such interactions were conducted while maintaining six feet of distance, it would not mitigate the risk of transmission, as "COVID-19 particles may 'linger in the air for minutes to hours' and may 'infect people who are further than 6 feet away from the person who is infected or after that person has left the space.'" *United States v. Hansen*, No. EP-12-CR-314-PRM, 2020

WL 7487836, at *4 (W.D. Tex. Dec. 10, 2020) (quoting *How COVID-19 Spreads*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last updated October 28, 2020)).

Appellant also shared a small office with another employee and had in-person contact with numerous others. JA187-190. Indeed, permitting unvaccinated employees to potentially expose other workers is sufficient in and of itself to create an undue hardship. *Algarin v. NYC Health + Hosps. Corp.*, 678 F. Supp. 3d 497, 511 (S.D.N.Y. 2023), *aff'd sub nom. Algarin v. New York City Health & Hosps. Corp.*, No. 23-1063, 2024 WL 1107481 (2d Cir. Mar. 14, 2024) ("permitting the [p]laintiff to potentially expose other workers at H+H to the COVID-19 virus" was a "significant hardship[] that create[d] an undue burden on the [d]efendant"). Even if Appellant did not pose a safety risk to patients (she did), the undisputed record evidence demonstrates that the nature of her interactions with other employees in her small office and throughout the Hospital created a safety risk that constituted an undue hardship.

Finally, Appellant appears to argue that the District Court did not properly consider the Supreme Court's clarification of the undue hardship standard in *Groff*. Seemingly, Appellant argues that the district court incorrectly relied on *Hardison* when it granted summary judgment for Sheppard Pratt based on the foregoing factors. Appellant's contention is simply not true, as the District Court explicitly

held, the indisputable evidence satisfied both the *Hardison* and **Groff** standards. JA284. Specifically, the district court explained that "whether [the evidence was] measured against the *Hardison* or **Groff** articulation of 'undue hardship,' the undisputed evidence establishes that granting [Appellant's] accommodation request would have constituted an undue hardship." JA284 (emphasis added). Accordingly, Appellant's contention that the District Court utilized the incorrect standard is misplaced.

### 4. It is Undisputed Dispute That Sheppard Pratt Considered Other Options.

In assessing an employee's religious accommodations request, an employer must consider more than the presented accommodation. *Groff*, 600 U.S. at 473. Indeed, employers must consider "other options" and determine if one is feasible. *Id*. The evidence shows that Sheppard Pratt engaged in the interactive process and considered alternatives to vaccination. The District Court properly concluded that Sheppard Pratt considered Appellant's proposed accommodation of masking and weekly testing, and determined that it was less effective than vaccination and still posed an untenable safety risk.

With the plethora of information available to Sheppard Pratt at the time, it justifiably concluded that vaccination was the best measure to reduce COVID-19 infections and transmission. JA54-57. Sheppard Pratt's COVID-19 vaccination policy gave the Center for Eating Disorders the highest likelihood of keeping its

patients and staff safe, and providing the high-quality care patients came from across the nation to Sheppard Pratt to obtain.

Appellant now contends she should have been permitted to work remotely and reassign her in-person responsibilities to another employee. Sheppard Pratt was under no obligation to reassign Appellant's essential job functions.

### a. Remote work Would have Imposed an Undue Hardship as it Required Waiving an Essential Job Function.

Appellant contends that Sheppard Pratt should have accommodated her with remote work. As an initial matter, Appellant never raised this argument in her Opposition to Defendant's Motion for Summary Judgment. Accordingly, Appellant waived this argument as the District Court never considered its merits and she cannot raise them for the first time here. *Bell*, 922 F.3d at 513.

Nevertheless, even if Appellant properly preserved this argument, it is without merit. Sheppard Pratt considered Appellant's request for remote work and properly concluded that she could not perform the essential functions of her position remotely. JA228-231. Sheppard Pratt had no obligation to waive the essential functions of Appellant's position—her face-to-face interactions with patients upon their admission. Forcing Sheppard Pratt to relieve Appellant of this essential function made the proposed accommodation of remote work unreasonable.

In arguing that remote work was a feasible accommodation, Appellant points to a prior instance where she briefly worked from home for a few days while sick.

Courts have consistently held that providing an employee with an accommodation previously "does not obligate it 'to continue providing such an accommodation.'" *Kizer*, 741 F. Supp. 3d. at 742–43 (quoting *E.E.O.C. v. JBS USA, LLC*, 115 F. Supp. 3d 1203, 1235 n. 19 (D. Colo. 2015)).

An employer does not "concede that a function is non-essential simply because [it] allows an employee to forego performing that function temporarily." *Kizer*, 741 F. Supp. 3d. at 743. The flexibility Sheppard Pratt provided Appellant by allowing her to work from home for a short duration while sick does not imply that it regarded the patient admission function of the position non-essential. Neither can Appellant reasonably assume that the measures taken to cover her essential functions for such a short period could be sustained indefinitely.

As the District Court correctly concluded, the in-person admissions interactions were an essential function of the Admissions Coordinator position. Appellant conceded that she could not perform her position remotely. JA210-211. Relieving Appellant of one of her essential job functions would have constituted undue burden. *Antredu*, 729 F. Supp. 3d 76, 84 (D. Mass. 2024) (citing *Bruff v. North Miss. Health Servs., Inc.*, 244 F.3d 495, 500 (5th Cir. 2001)) ("It likewise imposes an undue burden to require an employer to relieve an employee of her essential job functions and assign them to another employee.").

### b. Masking and Weekly Testing were Ineffective Alternatives to Vaccination.

Appellant has provided no evidence that masking and weekly testing adequately would have alleviated the safety risks posed by her decision to remain unvaccinated. Appellant claims guidance was available suggesting that the risk unvaccinated healthcare workers posed to patients and staff could be mitigated by wearing masks and taking weekly tests. Appellant, however, does not cite this alleged guidance and offers nothing but her conclusory assertion.

Sheppard Pratt considered Appellant's request for masking and weekly testing as a possible reasonable accommodation. JA56-57. However, like Sheppard Pratt, the District Court correctly determined that masking was not a true alternative given that all employees were required to mask regardless of their vaccination status, and weekly testing did not adequately alleviate safety concerns, nor was it feasible given that Sheppard Pratt did not have the capacity and resources to implement weekly testing.

It is undisputed and well supported by scientific data that vaccines are the most effective infection prevention measure and better protect against transmission than masking and weekly testing. JA54-57. Furthermore, because all employees were required to wear masks, the only additional layer of protection Appellant's proposed accommodation offered is weekly testing. JA56.

Weekly testing suffers from multiple shortcomings: (1) an individual can test negative for COVID-19 and still have COVID-19; (2) employees are at a constant risk of infection, therefore, weekly testing does not identify when an individual is infected and contagious; (3) testing once per week misses infections that develop subsequently but before the next test, up to one week later. JA56-57.

Appellant's unsupported assertion that masking and weekly testing could mitigate the risk posed by unvaccinated healthcare workers is undermined by numerous cases and federal guidance establishing that masking and weekly testing was not an adequate alternative means of infection control. *Snow v. Women's Healthcare Assocs., LLC*, No. 3:23-CV-01393-IM, 2024 WL 3640111, at *6 (D. Or. Aug. 2, 2024) (holding that that masking and testing in lieu of vaccination constituted an undue hardship); *see also Efimoff v. Port of Seattle*, v No. 2:23-CV-01307-BAT, 2024 WL 4765161, at *9 (W.D. Wash. Nov. 13, 2024) (collecting cases) (providing four independent reasons why "[f]ederal courts have found that masking, periodic testing, and social distancing requested by the unvaccinated employees as an accommodation is an undue hardship); *Panozzo*, 2022 WL 18779991, at *8 ("As to alternative means of infection control, while masking and testing are certainly valuable, they do not provide the same protection against serious employee illness, or death, from COVID-19 that a vaccine does."); *Kizer*, 741 F. Supp. 3d 726, 750 (W.D. Tenn. 2024) ("allowing [p]laintiff to come to work

unvaccinated while continuing [to mask, test, and social distance] would have been a substantial burden for St. Jude[,]" creating undue hardship); *Together Emps.*, 573 F. Supp. 3d at 434 ("[A]llowing any employee to decide instead just to mask, engage in periodic testing, and socially distance was not adequate to meet [its] urgent health and safety priorities and protect its vulnerable patient population." (alteration in original)); *see also* Medicare and Medicaid Programs; Omnibus COVID-19 Health Care Staff Vaccination**,** 86 Fed. Reg. 61555-01, 61614 (2021) ("Finally, we considered requiring daily or weekly testing of unvaccinated individuals. We have reviewed scientific evidence on testing and found that vaccination is a more effective infection control measure.").

Additionally, Sheppard Pratt did not have the capacity or resources to implement on site COVID-10 testing for all employees. JA57. Implementing weekly or daily on site COVID-19 testing for Appellant and all employees at the Hospital who requested a religious accommodation would have posed a substantial cost that was not feasible for Sheppard Pratt to bear as a non-profit entity. JA57. Indeed, it is well-settled that it is appropriate to consider the aggregate effects of multiple employees seeking the same accommodation. *Together Emps.*, 573 F. Supp. 3d at 436 ("[I]n determining undue hardship, it is appropriate to consider aggregate effects when multiple employees are granted the same accommodation.").

### c. Appellant's Argument that she Could have been Accommodated by use of Zoom or Teams or Plexiglass Barriers is not Preserved and Lacks Merit

In a new argument before this Court, Appellant contends that Sheppard Pratt could have erected plexiglass barriers for her to work behind, that she could have used teleconferencing software like Zoom or Teams to interact with new admissions and their families, or that another employee could be assigned to speak with them. This is the first time Appellant raised these alternatives and she has therefore waived their consideration by this Court. *Bell*, 922 F.3d at 513.

However, even if these alternatives were ripe for consideration, they would not have been reasonable accommodations. First, her contention that she could have used Zoom and Teams to interact with patients is futile for the same reason as remote work. Interacting with patients and facilitating their admission, in person, is an essential part of the Center for Eating Disorders' Admissions Coordinator position. Similarly, assigning this duty to another employee would have required Sheppard Pratt to waive an essential function of the job—thereby creating undue hardship. Moreover, interacting with patients on Zoom and Teams or assigning this function to another employee would not have adequately alleviated the risk Appellant posed to the employees with whom she came into contact.

Appellant presents a plexiglass barrier as a proposed accommodation to alleviate the risk she posed to patients. Appellant, however, presents no evidence

that plexiglass would mitigate the safety risk she posed to patients and staff or is as effective at vaccination at mitigating the spread of COVID-19. Even if plexiglass adequately mitigated the spread of COVID-19, Appellant could only use it as much as she was able to work where the plexiglass had been erected. Indeed, erecting plexiglass to separate Appellant from patients during their face-to-face interactions does nothing to mitigate the serious risk she posed to the employees with whom she came into contact, including her co-worker with whom she shared a small office. JA187-188. While Appellant does not suggest that a plexiglass barrier could have been used for all of her in person interactions, it would not have been feasible for Sheppard to erect plexiglass barriers in every place Appellant traversed in the Hospital.

### d. Sheppard Pratt Offered Appellant the Opportunity to Transfer to a Remote Position, Which she Declined.

Appellant also met with Karen Robertson-Keck, Ricky Santico, and Jennifer Mittelman to discuss potential accommodations. JA202-203. The essential functions of Appellant's position required her to work in person with direct contact with vulnerable eating disorder patients. JA186-187, JA189-193. As discussed above, Appellant could not be reasonably accommodated with remote work in her position. Ms. Robertson-Keck discussed with Appellant whether she had any other skillsets that would qualify her for positions that could be performed remotely and told Appellant she could apply to transfer to remote positions. JA223. Appellant,

however, did not apply to transfer to any other position within Sheppard Pratt. JA204-205, JA233-234.

Finally, Appellant alleges that Sheppard Pratt's determination that the risk posed by an Appellant's requested exemption could not be mitigated and constituted an undue hardship is proof Sheppard Pratt never intended to accommodate Appellant's religious beliefs. Appellant's conclusory allegation, however, is insufficient to defeat the uncontroverted evidence showing Sheppard Pratt diligently attempted to accommodate her. As explained above, Sheppard Pratt went to great lengths to explore whether a reasonable accommodation was available to Appellant prior to terminating her employment.

### 5. Sheppard Pratt's Approach to Medical Exemptions did not Require it to Grant Appellant's Request.

Appellant states that those with medical exemptions were permitted to test weekly. ECF No. 15 at 20. To the extent she contends that the medical exemptions Sheppard Pratt provided to seven employees at the Hospital with *bona fide* medical contraindications to the vaccine means that it was required to grant all religious exemption requests, her contention is flawed in numerous respects.

At the outset, the District Court correctly recognized the distinctions between the Americans with Disabilities Act (ADA) and Title VII. That is, medical exemptions pursuant to the ADA are controlled by a substantively different standard than is applicable to Appellant's claim, rendering the comparison inapposite.

*Groff* rejected the argument that in deciding claims for religious accommodation, courts should draw upon ADA caselaw. 600 U.S. at 471; *see also Groff*, 600 U.S. at 474 (Sotomayor concurring) (praising majority for not adopting ADA test). Indeed, the ADA mandates a higher standard of undue hardship in assessing medical exemption requests than Title VII does for assessing religious exemption requests. Following *Groff*, courts have consistently held that medical exemption requests are evaluated under a different standard than religious exemption requests, and thus they are not an apt comparison. *See Thompson v. Asante Health Sys.*, No. 1:23-CV-00486-CL, 2023 WL 7348812, at *7 (D. Or. Sept. 21, 2023), *report and recommendation adopted*, No. 1:23-CV-00486-CL, 2023 WL 7326496 (D. Or. Nov. 7, 2023) (citing *Groff*, 600 U.S. at 470–71) (rejecting plaintiff's allegation that employees seeking medical exemptions to the vaccine mandate were similarly situated to plaintiff who sought religious exemption because the conduct at issue was not similar, and "[t]he standards by which employers are required to accommodate religious requests and medical requests for exceptions to workplace requirements are not the same[,] . . . [and] conflating this standard with the medical standard and ADA case law would 'go too far.'"); *Brown v. MGM Grand Casino*, No. 2:22-CV-12978, 2024 WL 4819575, at *11 (E.D. Mich. Nov. 18, 2024) (noting that there is a difference between Title VII and ADA accommodations standards and that it is not disparate treatment to apply each independently).

Further, instructive is *Aukamp-Corcoran v. Lancaster Gen. Hosp.*, No. 19-5734, 2022 WL 507479 (E.D. Pa. Feb. 18, 2022). There, the plaintiff argued that because her employer had already granted numerous exemptions to the influenza vaccine, it would not be an undue burden to grant her religious exemption. *Id.* at *7. As *Groff* would likewise conclude later, the court in *Aukamp-Corcoran* distinguished medical from religious exemptions, stating that "[c]learly some employees should not undergo vaccination due to medical complication and must be exempt" from a vaccination requirement. *Id.* Importantly, "these necessary medical exemptions make it even more important for [the employer] to limit the number of additional exemptions to only those individuals who demonstrate an actual established right to a religious exemption." *Id.* Vaccination posed a "serious health threat" to the employees granted medical exemptions and they were "justifiably excused from the vaccination requirement . . . as the direct threat to their health outweigh[ed] the benefit to overall patient safety that could result from them undergoing vaccination." *Id.* at *8. Conversely, it would have been more dangerous to allow the plaintiff to work unvaccinated than it would have been to require her to obtain the influenza vaccine. *Id.*

The court stated that "each unvaccinated employee permitted to wear a mask increases the risk of influenza transmission to vulnerable patients." *Id.* Accordingly, "[t]he fact that other employees have been permitted to wear a mask instead of

undergoing vaccination increase[d] the danger posed by an additional employee such as Plaintiff receiving an exemption and being permitted to wear a mask[,] . . . [which] would result in an undue burden to Defendant." *Id.* at *8; *see also Together Emps.*, 573 F. Supp. 3d at 437 (stating "[the employer] does not have to show that it eliminated all risk from all possible sources of COVID-19 infection" to establish undue hardship in response to argument that accommodating plaintiff could not pose an undue hardship because defendant accommodated others); *Robinson v. Children's Hosp. Bos.*, No. CV 14-10263-DJC, 2016 WL 1337255, at *10 (D. Mass. Apr. 5, 2016) (undue hardship met where "the Hospital decided to achieve the safest possible environment for its patients" by seeking, "with the exception of those with medical issues, . . . as close to total compliance as possible by requiring all persons who work in or access patient-care areas to be vaccinated").

In essence, Appellant argues that because Sheppard Pratt permitted a small population of unvaccinated workers who requested medical exemptions, it was required to accept an even larger risk by accommodating her and more than 200 others, no matter the safety risk. On the few occasions in which Sheppard Pratt granted medical exemptions for employees whose job required in person contact, it did so because medical contraindications put their health at risk if they obtained the vaccine. The same cannot be said for Appellant. The aggregate effects of accommodating Appellant and the 200 other employees who requested religious

accommodations would have significantly increased the risk of COVID-19 transmission. The hardship would have been substantial and not one Sheppard Pratt was required to endure.

### 6. Appellant's Catch-All Arguments are also Unavailing.

Lacking evidence to create a genuine dispute of material fact, Appellant makes a serious of vague arguments in hopes of persuading this Court that Sheppard Pratt would not have suffered undue hardship if Appellant continued to work unvaccinated. For instance, Appellant cites *Stroup v. Coordinating Ctr.*, No. CV MJM-23-0094, 2023 WL 6308089 (D. Md. Sept. 28, 2023), for the misguided contention that Sheppard Pratt's evidence of an undue hardship was inadequate. Given the lack of context for Appellant's citation, Sheppard Pratt is left to assume that Appellant is arguing that the District Court improperly credited or lent too much weight to the affidavit of Dr. Peters. However, *Stroup* is wholly inapplicable to this case.

First, to the extent Appellant takes issue with when Dr. Peters was identified as a witness during discovery, she never sought to depose him at any point thereafter. Furthermore, Appellant did not move to strike the affidavit Sheppard Pratt submitted by Dr. Peters in support of its Motion for Summary Judgment. Accordingly, Appellant cannot raise a novel discovery issue before this Court. *Bell*, 922 F.3d at 513.

Regardless, *Stroup* and this case are distinct. The *Stroup* opinion denies a motion to dismiss or, in the alternative, for summary judgment. 2023 WL 6308089, at *1. Therefore, discovery had not yet been conducted. *Id.* at *8. Considering this, the *Stroup* court denied the defendant's motion due to the "limited evidentiary record," but notably did so without prejudice, allowing the parties to renew their arguments after "greater development of the evidence through discovery." *Id.*

Here, Appellant and Sheppard Pratt engaged in complete discovery and the record is fully developed. Sheppard Pratt moved for summary judgment based on the undisputed evidence that Appellant's requested accommodation would cause the Hospital undue hardship and that she could not otherwise be accommodated. Appellant fails to offer even a scintilla of evidence, beyond her own conclusory allegations, to create a genuine dispute of material fact and support her claim that Sheppard Pratt could have reasonably accommodated her.

Further, *Stroup* is inapposite because there the plaintiff worked remotely, was "rarely" in the field, and only appeared in the office in-person "once or twice a year prior to the [COVID-19] pandemic, and at no time afterwords in-person." 2023 WL 6308089, at *1. Here, it is undisputed that Appellant was required to work in person to perform the essential functions of her position, she had in-person contact with patients and staff, and she shared a small office with another employee. The record likewise is uncontroverted as to the increased safety risk posed by an unvaccinated

employee and ensuing impact on patient care and Sheppard Pratt's operations, thus demonstrating the undue hardship associated with Appellant's request.

Additionally, Appellant asserts that Sheppard Pratt's position that she was terminated in part because she "posed a risk to the coworker with whom she shared an office" is being raised for the first time in this proceeding. ECF No. 15 at 23. Appellant, however, failed to make this argument before the District Court and it is therefore waived. *Bell*, 922 F.3d at 513. Furthermore, Appellant's contention is false. Ms. Mittelman testified that in determining whether Appellant could be accommodated, Sheppard Pratt considered whether Appellant's job required her to be in person with other people and whether she worked in her own office, however, Appellant shared an office. JA 241.

In a final "Hail Mary," Appellant askes this Court, "what changed between August 21 and September 2021 that made Ms. Hall's unvaccinated status an undue hardship[.]" ECF No. 15 at 23. While this argument is entirely unclear and undeveloped, to the extent she is contending that Sheppard Pratt could not experience undue hardship simply because she had previously worked while unvaccinated, this logic would lead to absurd outcomes. Indeed, under Appellant's theory, in every case where an employee refused vaccination and was terminated, an employer's undue hardship defense would fail because the employee previously worked unvaccinated at some point.

Plainly, Appellant's argument prevents employers from considering changing circumstances and scientific advancement. Appellant's logic patently ignores the reality and evolution of the pandemic, where processes and procedures changed based on developments with both the pandemic itself, and the government's guidance and mandates based on scientific developments. JA59. For instance, at the time of Appellant's termination, the world faced the emergence of the Delta variant of COVID-19, which presented unique challenges given its increased virulence.

Finally, to the extent Appellant seeks to fault Sheppard Pratt for the individualized consideration it gave to each exemption request, this argument is likewise misplaced. Appellant alleges, without any citation to the record, that it took eight months for Sheppard Pratt render determinations on some accommodation requests. Not only is the assertion unsupported, but it is false.

Sheppard Pratt received Appellant's exemption request on August 30, 2021, and terminated her employment effective November 12, 2021. JA19-20, JA212. Sheppard Pratt individually reviewed over 200 religious exemption requests. JA225. In doing so, Ms. Robertson-Keck met with each employee's manager, and then conducted a second meeting with the employee and their manager to discuss the requested exemption. JA221-222. This time-consuming effort saw Ms. Robertson-Keck explore all possible accommodation options in an effort to grant as many exemptions as reasonably possible. JA223-223

It is not for Appellant to decide how quickly Sheppard Pratt was able to engage in the interactive process and evaluate over 200 religious exemption requests amid uncertainty during a pandemic while trying to comply with new government proclamations and keep its patients and employees safe. Appellant received the benefit of a thoughtful deliberative process. If Sheppard Pratt had engaged in a rushed process and did not individually assess each exemption request in the manner that it did, Appellant surely would have criticized Sheppard Pratt for not engaging in an interactive process and seriously considering her request. Appellant's argument that her claim has merit due to the time in which it took Sheppard Pratt to consider over 200 religious exemption requests is unavailing.

Ultimately, the District Court was correct in granting summary judgment in favor of Sheppard Pratt. Appellant lodges vague arguments before this Court that do nothing more than distract from the real issue—simply that Appellant wanted to continue working directly with vulnerable patients and other staff while unvaccinated. The record definitively establishes that Sheppard Pratt considered several accommodations, but none were feasible, and Appellant's continued presence posed a series risk to Sheppard Pratt's patients and staff which constituted an undue hardship. Appellant has not, and cannot, demonstrate a genuine issue of material fact on this point. Accordingly, this Court should affirm summary judgment in Sheppard Pratt's favor on Appellant's failure to accommodate claim.

## C. The District Court Properly Granted Summary Judgment on Appellant's Disparate Treatment Claim.

It does not appear that Appellant made a claim for disparate treatment. However, to the extent she claims that she is, the claim is waived and lacks merit. Disparate treatment claims are evaluated under the *McDonnell Douglas* burden shifting framework. *Chalmers*, 101 F.3d at 1017 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Initially, the employee carries the burden of making a *prima facie* showing. *Id.* The elements of a *prima facie* case of disparate treatment based on religious discrimination are: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Maryland Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). If the employee presents a *prima facie* case, the burden shifts to the employer to provide a legitimate, non-discriminatory reasons for the adverse action. *Chalmers*, 101 F.3d at 1017–18. If the employer can provide a non-discriminatory basis, the employee must show that the employer's explanation is merely pretext for discrimination. *Id.* at 1018.

Appellant's opening brief does not allege the District Court erred in granting summary judgment on a claim for disparate treatment. Indeed, Appellant never mentions the phrase "disparate treatment" in her briefing. As such, Appellant has abandoned the issue and precluded review by this Court on the merits of the claim.

Fed. R. App. P. 28(a)(8)(A); *Stokes*, 64 F.4th at 137 (quoting *Mayfield*, 674 F.3d at 377). Accordingly, this Court should not consider the merits of the District Court's summary judgment on the potential disparate treatment claim.

While it was unclear on the face of the Complaint whether Appellant raised a claim for disparate treatment, Sheppard Pratt addressed the merits of such a claim in its Motion for Summary Judgment. JA25-27. In its argument, Sheppard Pratt asserted that Appellant failed to establish a *prima facie* case, and that the Hospital had a legitimate, nondiscriminatory reason for the termination which could not be proven as pretextual. JA25-27. Appellant addressed this claim in her Opposition to Motion for Summary Judgment, however, she conceded that her "case is a failure to accommodate case." JA163. The District Court recognized it was unclear whether Appellant brought a disparate treatment claim but held: "[T]o the extent [Appellant] intended to assert a disparate treatment claim, Sheppard Pratt is entitled to summary judgment[.]" JA289.

Nonetheless, the District Court properly concluded that Appellant could not establish a *prima facie* case of disparate treatment because Appellant failed to provide valid comparators—individuals who "dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or

the employer's treatment of them for it." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223–24 (4th Cir. 2019) (alterations in original).

In that regard, Appellant vaguely referenced "colleagues" who refused vaccination but were not terminated. JA11, JA164. This allegation is woefully insufficient given the necessary specificity to establish that these colleagues are valid comparators. *Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 265 (4th Cir. 2008) ("The similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful."). Despite Appellant's burden in a disparate treatment claim, the record was void of any details concerning Appellant's comparators. As such, she failed to present the evidence necessary to establish such a claim.

Furthermore, to the extent Appellant claims she was treated differently because Sheppard Pratt provided medical accommodations, this claim fails for numerous reasons. Appellant did not identify any individuals who were provided such accommodations, which rendered her claim insufficient to survive summary judgment.

Nonetheless, individuals who were granted medical accommodations to the COVID-19 vaccination policy are not similarly situated to Plaintiff. As explained above in Section V.B.5 *supra*, medical exemption requests are subject to a different

standard under the law. Thus, individuals who requested medical exemptions are improper comparators to support Plaintiff's claims.

Even if Appellant had established a *prima facie* case of disparate treatment (she did not), the burden would shift to Sheppard Pratt to proffer a non-discriminatory reason for her termination. For the same reasons that Sheppard Pratt would have suffered an undue hardship, as articulated in section IV.B.3 *supra*, Sheppard Pratt's decision to terminate Appellant was based on a legitimate, non-discriminatory reason: protection of the health and safety of Sheppard Pratt's vulnerable patients and staff.

Likewise, Appellant has not offered, and cannot offer, any evidence to establish that Sheppard Pratt's concern for its patients and staff was pretext for discriminating against her based on her religion. Sheppard Pratt has never questioned the validity of Appellant's religious beliefs and actively worked with her to identify a suitable accommodation. Additionally, Appellant remains eligible for rehire. This belies any allegation that Sheppard Pratt had animus toward Appellant because of her religion.

The decision to terminate Appellant was based on her vaccination status—not her religion. Appellant acknowledges as much when she alleged in her Complaint that she "was terminated because she would not agree to become vaccinated." JA16. This is insufficient to demonstrate that she was terminated *because of* her religion.

*See D'Cunha v. Northwell Health Sys.*, No. 1:22-CV-0988 (MKV), 2023 WL 2266520, at *2 (S.D.N.Y. Feb. 28, 2023).

Ultimately, Appellant has not, either before this Court or the District Court, adduced any evidence creating a genuine issue of material fact concerning the basis for her termination. Accordingly, the District Court properly granted summary judgment on Appellant's claim of religious discrimination.

## VI.  CONCLUSION

For the reasons set forth above, this Court should affirm the District Court's award of summary judgment in Sheppard Pratt's favor and award Sheppard Pratt its costs on appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Sheppard Pratt does not believe oral argument is necessary for disposition of this appeal. The issues in this case involve the straightforward application of well-settled principles of federal law and do not warrant oral argument.

Date: April 15, 2025            Respectfully submitted,

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

By:  *s/Paul D. Burgin*
     Paul D. Burgin
     Garrick M. Ross
     Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
     One South Street – Suite 1800
     Baltimore, MD 21201
     (410) 843-3473 (telephone)
     (410) 558-6200 (facsimile)
     paul.burgin@ogletree.com

# CERTIFICATE OF COMPLIANCE

This Brief Complies with the type-volume limitations of Fed. R. App. P.

32(a)(7)(B) because:

This brief contains 12,769 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)

and the type and style requirements of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using Microsoft word in a 14-point proportional typeface, Times New Roman.

Date: April 15, 2025                     Respectfully submitted,

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

By:  */s/Paul D. Burgin*
Paul D. Burgin
Garrick M. Ross
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
One South Street – Suite 1800
Baltimore, MD 21202
Telephone: (410) 843-3473
paul.burgin@ogletree.com
garrick.ross@ogletree.com

# CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 15th day of April 2025, I caused this Brief of Appellee Sheppard Pratt Health System, Inc., to be filed electronically with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF user(s):

Theresa Kraft, Esq.
Wilt Toikka Kraft, LLP
1629 K Street NW – Suite 300
Washington, DC 20006

*Attorney for Appellant*

/s/Paul D. Burgin
*Counsel for Appellee Sheppard Pratt Health System, Inc*